GULF STATES UTILITIES COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 26172.  Promulgated June 19, 1951.

*William M. Rice, Esq.,* and *Claude M. Houchins, Esq.,* for the petitioner.

*J. Marvin Kelley, Esq.,* for the respondent.

OPINION.

BLACK, *Judge:* The three issues presented for our decision have been set forth in our preliminary statement. The first issue concerns expenses of petitioner incurred during 1938 and 1939, while the second issue concerns expenses of petitioner incurred during the year 1939. The taxable years involved are 1942, 1943, 1944, and 1945. Although the Commissioner determined an overassessment in petitioner's excess profits tax for 1942, we have jurisdiction over that year because petitioner filed claim for relief for that year (Form 843) under section 711 (b) (1) (J) of the Internal Revenue Code. The Commissioner has denied petitioner's claim for relief in part and section 732 (a), Internal Revenue Code, gives us jurisdiction of a timely appeal from such action of the Commissioner. The years 1938 and 1939 are before us as petitioner seeks relief under section 711 (b) (1) (J) of the Code. For the taxable years petitioner elected to compute its excess profits credit upon its base period net income, the years 1938 and 1939 being included in petitioner's base period. Petitioner contends that during the base period years it had two abnormal deductions satisfying the requirements of the applicable Code provisions, and hence should be disallowed as deductions in the computation of its base period net income. The disallowance would, in effect, increase petitioner's base period net income for the purpose of computing its excess profits tax credit, thereby increasing the credit for computing its excess profits tax and reducing petitioner's excess profits tax liability. The third issue involves a determination of the amount of Louisiana income taxes to be accrued and allowed as a deduction by petitioner. This latter issue does not involve any question of abnormality in the base period years.

1. Section 711 (b) was added to the Internal Revenue Code as a relief provision for corporate taxpayers who computed their excess profits tax credit based on income and who paid or incurred abnormal deductions during their base period years. *Green Bay Lumber Co.*, 3 T. C. 824. Petitioner seeks relief under the provisions of section 711 (b) (1) (J) and (K) which are set forth in the margin.[1]

---

[1] SEC. 711. EXCESS PROFITS NET INCOME.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(b) TAXABLE YEARS IN BASE PERIOD.—

(1) GENERAL RULE AND ADJUSTMENTS.—The excess profits net income for any taxable year subject to the Revenue Act of 1936 shall be the normal-tax net income, as defined in section 13 (a) of such Act; and for any other taxable year beginning after December 31, 1937. and before January 1. 1940. shall be the special-class net income, as defined in section 14 (a) of the applicable revenue law. In either case the following adjustments shall be made (for additional adjustments in case of certain reorganizations, see section 742 (e)) :

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

In order for a taxpayer to be entitled to have abnormal deductions disallowed in the computation of its base period net income, each requirement of the appropriate sections of the Internal Revenue Code must be satisfied. In the event taxpayer fails to satisfy any one of the provisions of the Code, his contentions for relief must fail. The taxpayer must establish not only that the claimed expenses were abnormal but also that they were not a consequence of any of the limiting factors of section 711 (b) (1) (K). As to the first issue, since petitioner, in our opinion, failed to establish that its obligation to make $8,000 monthly payments to Standard Oil, the abnormality "is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer," (see section 711 (b) (1) (K) (ii)) we need not consider the other statutory requirements which, as contended by respondent, were not satisfied by the petitioner.

How is the petitioner to establish this negative? A similar situation was presented in *William Leveen Corporation*, 3 T. C. 593, where we said:

To establish such a negative may be a difficult task, and how it is to be accomplished cannot be formulated in a rule. Perhaps the proof is best made by proving affirmatively that the abnormal deduction is a consequence of something

---

(J) Abnormal deductions.—Under regulations prescribed by the Commissioner, with the approval of the Secretary, for the determination, for the purposes of this subparagraph, of the classification of deductions—

   (i) Deductions of any class shall not be allowed if deductions of such class were abnormal for the taxpayer, and

   (ii) If the class of deductions was normal for the taxpayer, but the deductions of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years, they shall be disallowed in an amount equal to such excess.

(K) Rules for application of subparagraphs (H), (I), and (J).—For the purposes of subparagraphs (H), (I), and (J)—

   (i) If the taxpayer was not in existence for four previous taxable years, then such average amount specified in such subparagraphs shall be determined for the previous taxable years it was in existence and the succeeding taxable years which begin before the beginning of the taxpayer's second taxable year under this subchapter. If the number of such succeeding years is greater than the number necessary to obtain an aggregate of four taxable years there shall be omitted so many of such succeeding years, beginning with the last, as are necessary to reduce the aggregate to four.

   (ii) Deductions shall not be disallowed under such subparagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

   (iii) The amount of deductions of any class to be disallowed under such subparagraphs with respect to any taxable year shall not exceed the amount by which the deductions of such class for such taxable year exceed the deductions of such class for the taxable year for which the tax under this subchapter is being computed.

other than the increase in gross income and that such proven cause is the converse or opposite of an increase in gross income and could not be identified with an increase in gross income. But difficult as the proof of the negative may be, it is what the statute requires; and, since it is required in clear and express terms, its rigors may not be abated by softening construction.

The findings of fact have set forth the situation of petitioner's business in 1938. Petitioner was expanding its plant facilities to care for the needs of Standard Oil, Ethyl, its domestic and other consumers. After September 15, 1937, petitioner had two contracts with Standard Oil which we have designated as the Old Contract and the New Contract. There was no fixed date on which the New Contract was to replace the Old Contract. Under the terms of the Old Contract, it was to continue indefinitely, unless one of the parties thereto gave written notice to the other, with the earliest date for termination of the Old Contract being May 1, 1940. Under the provisions of the New Contract, however, petitioner could elect to terminate the Old Contract at an earlier date, any date between December 1, 1938 and May 1, 1940. In addition to these two significant dates, the New Contract provided that after April 1, 1939, petitioner would be liable for $500 daily penalty unless steam and electricity were delivered in the increased quantities provided for in the New Contract, even though still operating under the terms of the Old Contract. Petitioner elected to commence the selling of steam and electricity to Standard Oil under the terms of the New Contract at the earliest possible date, December 1, 1938, and thereby became liable to Standard Oil for payment of $8,000 monthly until May 1, 1940.

What would have been the effect on petitioner's net profit if it had elected to come under the terms of the New Contract effective April 1, 1939? What would have been the effect on petitioner's income and deductions had the effective date for coming under the terms of the New Contract been delayed until May 1, 1940? One consequence to petitioner from the exercise of its election was obvious, its net income was reduced at the rate of $8,000 per month by the payments to Standard Oil. If this were the only consequence, why did petitioner exercise its option to come under the terms of the New Contract at the earliest possible date? Were there not other consequences of its election to come under the terms of the New Contract upon petitioner's gross income or deductions, or in the type, manner of operation, size, or condition of the business engaged in by the taxpayer? Petitioner submitted evidence relating to the consequences of its election to come under the terms of the New Contract, as follows: (1) the two contracts; (2) testimony of petitioner's manager of its Louisiana properties; (3) a schedule of receipts from Standard Oil, its receipts in full and its deductions; and (4) a schedule of electricity and maximum steam demands of Standard Oil.

An examination of the contracts reveals differences in that the New Contract provides for: (1) larger demand charges to be paid by Standard Oil, (2) the maximum demand for steam to be increased, (3) a decrease in the service charge per 1,000 pounds of steam, (4) fuel was to be supplied by Standard Oil without charge, (5) a change in the service charge per kilowatt hour of electricity, and (6) a change in ratio of electric service per 1,000 pounds of steam from 20 kw. hr. to 23 kw. hr. The New Contract also contains other detailed provisions providing for contingencies not considered in the Old Contract. In determining the consequences of petitioner's election to operate under the terms of the New Contract as of December 1, 1938, many variables must therefore be considered.

Petitioner has also introduced in evidence two exhibits showing (1) maximum steam demands actually supplied in a single hour during each month from January 1936 to May 1940 and maximum electric demands actually supplied in kilowatts each month from January 1936 to May 1940, and (2) annual sales in dollars of steam and annual sales in dollars of electricity to Standard Oil from 1930 through 1942, including petitioner's profit and loss summary statements for those years.

Leonard, who managed the Louisiana properties of petitioner, was asked by petitioner's counsel:

* * * Why did you terminate the old contract on December 1, 1938, and incur that expense?

He replied:

I terminated the old contract effective December 1, 1938, and by doing so, I obligated the company to pay the cancellation charge of $8,000 per month. I did that, terminated the contract in order to get it out of the way. Once it was disposed of and out of the way, we were enabled to operate under the new contract; and, in my opinion, the company did operate more advantageously than we expected it would under the new contract.

The reply of Leonard to this question was that it was *advantageous* to the petitioner to come under the terms of the New Contract. But why was it advantageous? Does he mean it was more profitable to petitioner to operate under the terms of the New Contract? Leonard further testified:

The earliest that we could make the new agreement effective was as of December 1938.

* * * * * * *

Consequently, we wouldn't conceivably have made a decision until immediately prior to that time, when we had made a canvass of the situation and would have known about lots of things.

Petitioner's election was exercised only after a careful consideration of the consequences to petitioner's business.

The two exhibits, even when considered with the testimony of Leonard and the differences in the contracts, fail to support a finding that the petitioner established that the monthly expense of $8,000 incurred by petitioner was not, to use the language of section 711 (b) (1) (K) (ii),

> * * * a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

Section 711 (b) (1) (K) (ii) is explicit, saying that "unless the taxpayer establishes," and petitioner, in our opinion, has failed to satisfy this provision of the Code.

As to the first issue, we hold that the deduction for payments to Standard Oil is not to be disallowed in the computation of petitioner's net income during the 1938 and 1939 base years under section 711 (b) (1) (J), I. R. C., as petitioner failed to satisfy the rule of section 711 (b) (1) (K) (ii), I. R. C.

2. The second issue relates to a deduction claimed by petitioner in 1939. Documentary stamp taxes amounting to $36,572.60 were incurred by petitioner in connection with the refunding of its funded debt. Petitioner contends the deduction is abnormal as to amount and should be disallowed in the computation of its base period net income, relying on section 711 (b) (1) (J) (ii). It has been stipulated that as computed under the rule of section 711 (b) (1) (J) (ii) the amount of United States and State of Texas documentary stamp taxes for the year 1939 was in excess of 125 per cent of the average amount of documentary stamp taxes incurred and paid for the four preceding taxable years by an amount of $23,582.84.

The respondent in his brief has relied upon the sole contention that "documentary stamp taxes" is not a separate class of taxes, but must be grouped with all taxes deducted by petitioner under section 23 (c), I. R. C. Under such a grouping the abnormality, as computed under the rule of section 711 (b) (1) (J) (ii), is eliminated. Respondent does not contend that the limitations prescribed by section 711 (b) (1) (K) (ii) apply as to this claimed abnormality of $23,582.84, and it is clear they do not apply and we have so determined in our findings of fact. We do not think the Commissioner can be sustained in his contention that petitioner's expenditures for documentary stamps must be grouped with all the rest of its taxes, such as income, franchise, ad valorem property, and other recurring taxes necessarily incident to petitioner's day-by-day operations in determining whether the 125 per centum provisions contained in section 711 (b) (1) (J) (ii) apply to petitioner's documentary stamp deductions in 1939.

Decisions of our Tax Court have definitely established that the broad classification "taxes" may be broken into smaller classes for purposes of section 711 (b) (1) (J). Thus, in *Wentworth Manufacturing Co.*, 6 T. C. 1201, Illinois unemployment tax was treated as a separate class of deduction; in *Horton & Converse*, 8 T. C. 487, Federal declared value excess-profits tax was considered separately; in *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350, ad valorem property taxes were considered as separate from other taxes, although our Court refused to distinguish between certain special school district levies and other ad valorem levies; in *Harris Hardwood Co.*, 8 T. C. 874, unemployment compensation taxes were considered apart from other taxes; and in *Frank H. Fleer Corporation*, 10 T. C. 191, manufacturer's excise taxes were considered as a separate class.

Petitioner does not claim that the documentary stamp taxes paid in 1939 were abnormal in class. It only claims that such taxes were abnormal in amount within the meaning of section 711 (b) (1) (J) (ii). The only requirement of section 711 (b) (1) (J) (ii) is that the deductions "of such class were in excess of 125 per centum of the average amount of deductions of such class for the four previous taxable years." The stipulated facts make proof of this requirement and it is believed that petitioner has met its burden of proof with respect to Issue 2. This issue is decided in favor of the petitioner.

3. The third issue relates to the amount of Louisiana state income tax to be accrued and allowed as a deduction in computing petitioner's Federal income and excess profits taxes for the taxable years 1944 and 1945. The petitioner contends that:

The correct amount of Petitioner's State of Louisiana income tax for each of the years 1944 and 1945, which amount was determinable at the close of each such year, should have been computed by including as deductions, (a) an amount covering amortization of emergency or defense facilities over a period of 60 months beginning with the month following that in which the facilities were completed and (b) a proper portion of the correct amount of Federal income and excess profits tax for the year.

As the (b) portion of petitioner's contention quoted above will follow as a matter of course under a recomputation of tax under Rule 50, no issue is presented for our decision. There remains under the (a) portion of petitioner's contentions an issue which becomes the third issue to be determined.

The petitioner has by appropriate assignment of error contested the amount of deduction for State of Louisiana income taxes allowed by respondent in the determination of petitioner's income and excess profits tax liability for the years 1944 and 1945. In determining the amounts of petitioner's State of Louisiana income tax accruable and deductible in 1944 and 1945 for Federal income tax purposes, the

Commissioner has deducted from income allocable to Louisiana an aliquot part of petitioner's amortization of emergency facilities computed over the shortened period of less than 60 months which was fixed by Presidential Proclamation. If it is determined that respondent correctly computed petitioner's Louisiana income tax to be accrued and allowed as a deduction, it has been stipulated that the following deductions for amortization of emergency facilities are correct:

| Year | Amount |
|------|--------|
| 1944 | $1,515,689.22 |
| 1945 | 1,183,365.46 |

Petitioner contends that a larger amount of Louisiana income tax should be accrued and allowed as a deduction on its 1944 and 1945 Federal tax returns for its liability to the State of Louisiana for income tax. If it is determined that the smaller amount of amortization should be deducted in computing petitioner's Louisiana income tax to be accrued, it has been stipulated that the following deductions for amortization of emergency facilities are correct:

| Year | Amount |
|------|--------|
| 1944 | $537,674.29 |
| 1945 | 552,374.66 |

A deduction for such taxes as these is allowed under section 23 (c) of the Internal Revenue Code. The only question here is the proper amount of tax to be accrued and allowed as a deduction during the taxable years. The respondent determined that the smaller amounts of tax should be deducted without stating his reasons, but apparently respondent relied upon *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516. There the taxpayer contested in the Mississippi courts its liability for a state gasoline tax and, at the same time, accrued and claimed as a deduction on its Federal income tax return the amount of the state gasoline tax. The Supreme Court ruled that a deduction for taxes is not to be allowed "where the liability is contingent and is contested by the taxpayer."

In *Burton-Sutton Oil Co.*, 3 T. C. 1187, we decided two issues that involved the question of the proper year for an accrual basis taxpayer to deduct State of Louisiana income taxes and franchise taxes. Since the taxpayer was contesting its Louisiana income tax liability for the years 1937 and 1938, in reliance on *Dixie Pine Products Co.* v. *Commissioner, supra*, we held that the taxpayer was not entitled to deduct during the years 1937 and 1938 the contested additional income tax liability asserted in 1941 against the taxpayer by the Department of Revenue of the State of Louisiana. But as to the other issue, the deficiency in franchise taxes asserted by the Department of Revenue of the State of Louisiana in November 1940, we held the taxpayer was allowed to accrue and deduct the tax deficiency in 1937 and 1938 for

the liability for additional taxes was paid and not contested by the taxpayer.

In *H. E. Harman Coal Corporation*, 16 T. C. 787, the accrual basis taxpayer was notified by the State of Virginia in 1941 of a deficiency in state income taxes for the years 1938 and 1939. The state income tax deficiency was paid in 1941 and claimed as a deduction on its 1941 Federal tax return. As the deficiency in state income tax was not contested, the tax was disallowed as a deduction in 1941.

Is the petitioner contesting its Louisiana income tax liability for the years 1944 and 1945? It has been stipulated: "Petitioner has not contested the correctness of the principle [the principle that caused the rejection of the 1943 claim] and does not intend to do so." It was further stipulated that in the year 1944 petitioner computed its Louisiana income tax liability by deducting amortization on a 60-month period and accrued its tax deduction for Federal income and excess profits tax accordingly. For the year 1944 petitioner has filed a claim for refund, but the claim is being denied by the State of Louisiana and petitioner does not plan to litigate the question. It was further stipulated that in the year 1945 petitioner computed its Louisiana income tax and the accrual of state tax as a deduction for Federal income tax purposes by deducting amortization over a period of less than 60 months. We can see no reason why petitioner cannot expect a deficiency to be asserted by the State of Louisiana for the year 1945. Under the rule of *H. E. Harman Coal Corporation*, *supra*, petitioner, an accrual basis taxpayer who concededly is not contesting its liability for Louisiana income taxes, would not be allowed a deduction under section 23 (c) of the Code, either in the year of payment of the tax deficiency or in the year the tax deficiency was determined. The proper years for the deductions for petitioner must, therefore, be 1944 and 1945. In view of the stipulations, it is determined that petitioner is not contesting the additional Louisiana income tax.

What is the proper amount of Louisiana income tax to be accrued by petitioner? That is to say, is the petitioner's Louisiana income tax liability to be computed by deducting amortization of emergency facilities on a 60-month period, or may petitioner use a shortened period for computing its amortization deduction? This question is one to be determined by the Louisiana income tax laws and can most appropriately and properly be done by their own department of revenue and courts. Fortunately, we need not interpret the law and weigh the merits of the question for rulings on petitioner's claims have been made by the appropriate state department. It has been argued by respondent that the original ruling of the Department of Revenue of Louisiana is contradictory to the position taken by the taxing authority in disallowing petitioner's claim. This may be true,

but the denial by the Department of Revenue of Louisiana of petitioner's claim in July 1948 was subsequent to the principle contained in Louisiana Revenue Bulletin, Volume 1, Number 2, issued November 25, 1940. Furthermore, the denial of petitioner's claim is a specific ruling on petitioner's liability for Louisiana income taxes, and we see no reason why it should not dispose of the issue though the revenue bulletin may be to the contrary.

It appears from the facts which have been stipulated that petitioner's Louisiana income tax liability will be determined by allowing to petitioner only the smaller deduction based upon amortization over a 60-month period. Accordingly, petitioner should be allowed to accrue as a deduction in 1944 and 1945 the larger liability for Louisiana income taxes, since the difference in tax is not being contested by petitioner. This issue is decided in favor of the petitioner.

*Decision will be entered under Rule 50.*