THE ELECTRIC MATERIALS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54922.  Filed August 31, 1956.

*William F. Illig, Esq.*, for the petitioner.
*George J. Rabil, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge:* The Commissioner determined a deficiency of $705.16 in income tax for 1951, a deficiency of $1,022.88 in excess profits tax for 1950, and a deficiency of $392.65 in excess profits tax for 1951. The petitioner eliminated $23,871.38 for the base period year 1946 as an abandonment deduction in computing its excess profits tax credit on its returns for the taxable years. The issue for decision is whether it has shown that it meets the requirements of section 433 (b) (10) (C). That section provides:

(C) Deductions of any class shall not be disallowed under such paragraph unless the taxpayer establishes that the increase in such deductions—

(i) is not a cause or a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, which increase or decrease is substantial in relation to the amount of the increase in the deductions of such class, and

(ii) is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer.

The Commissioner does not question the fact that the petitioner has met the other requirements of the statute. The facts have been submitted by a stipulation, which is adopted as the findings of fact.

The petitioner filed its income and excess profits tax returns for the years 1950 and 1951 with the collector of internal revenue for the twenty-third district of Pennsylvania. Its books were kept and its returns filed on an accrual basis of accounting. It is engaged in the manufacture of material for electrical equipment.

The petitioner erected at its manufacturing plant an old second-hand power plant, which it had purchased elsewhere, and put it into operation at some time in 1940. It also acquired boilers, coal- and ash-handling equipment, and other equipment needed for the operation of a high-pressure steam heating system for its plant. It thereafter used the equipment mentioned to produce its own steam for heating its plant until February 1942.

The petitioner had purchased from a public utility all of the electric energy which it used for power prior to February 1942, at which time it installed electric generating equipment. It generated a part of its electric power and heated its buildings with exhaust steam from the generator engine thereafter until May 1946.

The petitioner was studying various methods of improving the efficiency of its power plant during the years 1942 to the early part of 1946. It employed consulting engineers in this connection, and it reached the conclusion that its high operating cost was due in part to inefficiency of the boilers. The board of directors, on March 8, 1946, authorized the abandonment of the power plant and the substitution of an automatic low-pressure heating system. The power plant was shut down in April, and the petitioner purchased all of its electric power requirements from a public utility after May 1946. The petitioner contracted in June 1946 for oil-fired heating boilers, which were delivered on November 7, 1946, and were in operation by February 1947. The change from the high-pressure to the low-pressure steam system of heating also involved a change from coal to oil as the fuel to fire the boilers. The new system occupied only a small part of the old powerhouse. The same radiators were used under the new system as had been used formerly.

The old power plant has not been used since 1946 and it had no value after abandonment except as scrap.

The Commissioner allowed the petitioner a deduction of $23,871.38 for 1946, representing the loss on the abandonment of the power plant equipment.

The average number of kilowatt-hours of power which the petitioner purchased yearly from a public utility and the average cost thereof were as follows: For the years 1937 through 1941, 502,880 kilowatt-hours and $10,624.21; for the years 1943 through 1945, 384,947 kilowatt-hours and $7,896; and for the years 1947 through 1949, 932,559 kilowatt-hours and $19,865.73.

The base period for the purpose of computing the excess profits tax credit for the taxable years, consists of the years 1946 through 1949. Sec. 435 (b). The following table shows the net sales, cost of sales, gross income, and pounds of copper produced with relation to the petitioner for the years indicated:

| Item | 1945 | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|---|
| Net sales | $1,185,810 | $1,424,338 | $1,854,531 | $2,081,494 | $1,406,634 |
| Cost of sales | 978,405 | 1,073,145 | 1,479,454 | 1,640,697 | 1,219,422 |
| Gross income | 207,405 | 351,193 | 375,077 | 440,797 | 187,212 |
| Pounds of copper produced [1] | 3,164,305 | 3,564,697 | 3,560,941 | 3,684,395 | 2,498,587 |

[1] The pounds of copper produced and the pounds of copper sold during the base period years were substantially equal.

The following table shows the cost of producing heat and power in the petitioner's own plant for the years indicated:

| | 1945 | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|---|
| Labor | $11,652.88 | $11,559.32 | $11,358.55 | $8,216.94 | $5,676.00 |
| Power | 21,601.45 | 13,042.37 | 19,789.81 | 20,931.67 | 19,660.24 |
| Coal | | 7,907.28 | 1,105.24 | | |
| Water | 639.67 | 787.31 | 950.00 | 750.00 | 1,000.00 |
| Freight—coal | 9,511.21 | 5,206.49 | 607.36 | | |
| Payroll taxes | 257.43 | 250.00 | 250.00 | 144.59 | 94.00 |
| Fuel oil | | 1 1,721.27 | 25,732.99 | 31,587.05 | 24,087.63 |
| Total | $43,662.64 | $40,474.04 | $59,793.95 | $61,630.25 | $50,517.87 |

1 The petitioner's records disclose that in December 1946 23,063 gallons of fuel oil at a cost of $1,721.27 were used in its old coal-fired heating boilers by running an oil line to these boilers to supplement the then low coal supply.

The petitioner, in computing its excess profits credit, used the following amounts as excess profits net income for the base period years:

| | |
|---|---|
| 1946 | $135,390.12 |
| 1947 | 144,833.10 |
| 1948 | 195,634.86 |
| 1949 | (loss) |
| Average | $118,964.52 |

The Commissioner gave the following explanation in the statement attached to the notice of deficiency:

It is determined that you are not entitled to disallow an abandonment loss of $23,871.38 for the year 1946 in computing your excess profits tax credit for the year 1950 [and 1951] under the provisions of section 435 of the Internal Revenue Code [income method], inasmuch as you have not established that said loss is not a cause or a consequence of an increase in your gross income in your base period or a decrease in the amount of some other deduction in your base period and is not a consequence of a change at any time in the manner of operation of your business as required by section 433 (b) (10) of the Internal Revenue Code.

"Abandonment" is one of the classes of adjustments allowed by the statute in computing the excess profits credit, but a deduction allowed for one of the base years for abandonment cannot be disallowed in computing the excess profits credit unless it meets the requirements of section 433 (b) (10) (C) quoted above. Failure to establish any one of those three negatives is fatal to this taxpayer's case. Cf. *William Leveen Corporation*, 3 T. C. 593, 595.

The petitioner has failed to prove that the deduction allowed for 1946, based upon the abandonment of its old power plant and representing the unrecovered cost of all of its power plant equipment in excess of salvage, was not a consequence of a change in the "manner of operation" of the business which it engaged in, within the meaning of section 433 (b) (10) (C) (ii). The change from generating a large part of its own power requirements in its own plant and from

heating the plant with the same boilers used for generating the power, to purchasing its entire power requirements from a public utility and heating the plant with a wholly new system was a change in the manner of operation of the business of sufficient magnitude and importance to disqualify the petitioner under the provision just mentioned. The number of kilowatt hours purchased and the cost before, during, and after the change is some indication of the size and importance of the change. That change related directly to the operation of the business and to major items of cost. It had been the subject of much study and discussion. Engineers had been consulted. The change was expected to result in substantial economies. These, and perhaps other circumstances, show that the change was a substantial one in the operation of the business, and the abandonment of the power plant equipment was a direct consequence of this change in the manner of operation of the business. Cf. *Wentworth Manufacturing Co.*, 6 T. C. 1201, 1208–9; *Gulf States Utilities Co.*, 16 T. C. 1381; *Crow-Burlingame Co.*, 15 T. C. 738. Those cases were decided under different provisions of the law but both parties regard cases decided under those provisions as pertinent authority here. Cf. *Fulton Foundry & Machine Co.*, 26 T. C. 953.

The questions of whether the petitioner has shown that it is not disqualified under the two provisions of section 433 (b) (10) (C) (i) need not be considered, since the holding above is fatal to the petitioner's case in any event.

*Decision will be entered for the respondent.*