The **ELECTRIC MATERIALS COMPANY**, Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 12106.

United States Court of Appeals Third Circuit.

Argued March 5, 1957.

Decided April 5, 1957.

William F. Illig, Erie, Pa. (Gifford, Graham, MacDonald & Illig, Erie, Pa., on the brief), for petitioner.

C. Guy Tadlock, Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before MARIS and GOODRICH, Circuit Judges, and McILVAINE, District Judge.

GOODRICH, Circuit Judge.

This is an excess profits tax case arising under the "Korean" statute of 1950. The precise question involved is whether the taxpayer has met the burdens imposed upon it by Section 433(b) (10) (C), 26 U.S.C. Excess Profits Taxes, § 433(b) (10) (C). The statutory language is as follows:

"Deductions of any class shall not be disallowed under such paragraph unless the taxpayer establishes that the increase in such deductions—

"(i) is not a cause or a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, which increase or decrease is substantial in relation to the amount of the increase in the deductions of such class, and

"(ii) is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer." Int.Rev.Code of 1939, § 433 (b) (10) (C), added by Excess Profits Tax Act of 1950, 64 Stat. 1146 (1951).

The Excess Profits Tax was designed to siphon off excessive profits earned during the war years. In order to determine the extent of abnormal profit, a taxpayer may establish his theoretical normal income by averaging his income in the pre-war base years 1946 through 1949. The starting point is actual taxable income to which adjustments must be made to eliminate distorting abnormalities. An abnormally large deduction in a base year causes net taxable income to be abnormally low. Consequently, taxpayers may "disallow" certain abnormal deductions, that is, reconstruct theoretical normal income by ignoring abnormal deductions which were allowed for the purpose of computing regular taxable income during the base year. However, one of the things which a taxpayer must do before he can have a deduction disallowed is to prove three negatives: that it was "not a cause or a consequence of an increase in [his] gross income," (subclause (i) of § 433(b) (10) (C)), "or a decrease in the amount of some other deduction," (ibid.), and that it was not a consequence of a change in the business, (id. subclause (ii)).

In this case, the Tax Court affirmed the Commissioner's determination of a deficiency in taxpayer's Excess Profits

Tax for 1950. 1956, 26 T.C. 997. In computing taxpayer's excess profits net income, the court refused to disallow an abandonment deduction which had been allowed in computing 1946 income tax. The court held that taxpayer had failed to prove the deduction was not the consequence of a type of change in the business identified in sub. (ii) of § 433(b) (10) (C). The court found it unnecessary to review the Commissioner's determination that taxpayer had also failed to establish the two negative propositions in sub. (i). Taxpayer brings this case to us for review as he may do under Int. Rev.Code of 1954, § 7482(a), 26 U.S.C. § 7482(a).

The first point with which we are immediately concerned is the language of sub. (ii) quoted above. It must be determined that the taxpayer's abnormally large abandonment deduction in 1946 was not a consequence of a change "in the type, manner of operation, size, or condition of the business engaged in by the taxpayer."

█ The Commissioner urges that the answer to the question is a fact conclusion wherein we must sustain the Tax Court unless its conclusion is "clearly erroneous."[1] We think there is little benefit to be gained in discussing whether the conclusion required by the statutory language is a conclusion of fact or a conclusion of law or a mixture of both. Whatever it is, it is the ultimate conclusion that determines the outcome of the case. Here we have no question of deciding the truthfulness of one witness as against another. All the facts are stipulated. We think in this type of situation that we have the responsibility of deciding. The Government suggests that we are bound to take the decision of the Tax Court unless it is too much for us to swallow. We, and other courts as well, have rejected this suggestion in analogous situations many times in the last few years. E. g. Kilby v. Folsom, 3 Cir., 1956, 238 F.2d 699; Matter of Pioch, 3 Cir. 1956, 235 F.2d 903; Curtis Co. v. Commissioner, 3 Cir. 1956, 232 F.2d 167; Goldberg v. Commissioner, 5 Cir., 1955, 223 F.2d 709. This we would not emphasize again except for the fact that the point is novel as it affects this particular tax. Under the World War II Excess Profits Tax Act, Tax Court decisions on the issue now before us were final but under the Korean statute courts of appeals have authority to review.[2]

The controlling facts here are quickly and simply stated. This taxpayer makes electrical equipment. In 1937 it purchased from a firm in Kentucky a secondhand power plant which it erected adjacent to its manufacturing plant in North East, Pennsylvania. The plant was put into operation in 1940 for heating purposes only. Prior to 1942 taxpayer purchased all of its electricity from a public utility company and it produced its own steam for heat using coal. In 1942 it installed electric generating equipment. Until the spring of 1946, taxpayer produced its own heat with coal as fuel and generated part of its electric power, purchasing the balance from the public utility. In 1946 having come to the conclusion that its heating and energy-producing system was too expensive it shut down its power plant. It began purchasing all of its electrical power requirements from a public utility and by early

---

1. We are given specific statutory authority to review Tax Court decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury * * *." Int. Rev.Code of 1954, § 7482(a).

2. Under the World War II Act, Tax Court decisions on this particular point were made final by Int.Rev.Code of 1939, § 732(c), added by 1941 amendment to Excess Profits Tax Act of 1940, 55 Stat. 26 (1941), 26 U.S.C. Excess Profits Taxes, § 732(c). See Corn Products Refining Co. v. Commissioner, 2 Cir., 1954, 215 F.2d 513, affirmed on another point, 1955, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29; Colonial Amusement Co. v. Commissioner, 3 Cir., 1949, 173 F.2d 568. But cf. Commissioner of Internal Revenue v. Blue Diamond Coal Co., 6 Cir., 1956, 230 F.2d 312.

The Korean Act had no analogous provision precluding review. Cf. the general review provision quoted in note 1, supra.

1947 had supplanted its coal burners with oil-fired burners installed in the old powerhouse. The company was advised that its old equipment was suitable only for scrap.

On these facts has the taxpayer proved that it has not changed the type, manner of operation, size, or condition of its business? It has not changed its size; during 1946 and 1947, the changeover years, the total output of copper produced was less than it had been at the top of the war demand in 1942 or 1943. Before and after 1946, it made the same products with substantially the same personnel and at the same location. The difference is that it buys all of its electricity instead of some of it from a public utility and it heats its plant with oil instead of coal.

█ We are advised that this is the first case to come to any federal appellate court under the 1950 statute. The wording of this part of the 1950 Korean act is the same as that of the 1940 World War II statute.[3] The decisions of the Tax Court under that statute are relevant source material for us.

█ The burden of proving the negatives used in the statutory language is on the taxpayer. William Leveen Corp., 1944, 3 T.C. 593. The Tax Court held in one case that the establishment of air-conditioning facilities did not cause a change in the type, etc., of the business. "Petitioner continued to operate just as it had before the improvements were made," said the court. Consolidated Apparel Co., 1952, 17 T.C. 1570, 1581. The contrast in what does meet the requirement and what does not is well brought out by comparing Wentworth Mfg. Co., 1946, 6 T.C. 1201, with Mine and Smelter Supply Co., 1948, 10 T.C. 1179. In the Wentworth case the company employed

for the first time a good-sized number of inspectors and measurers in an effort to standardize the size of the undergarments it produced. This was a change in the method of doing business. (On the other hand, the company was relocating its plant and incurred expenses for moving and for cancellation of a lease. These expenses were held to be not a consequence of a change in the type, manner of operation, etc. of the business.) But in the Mine and Smelter case, supra, the court thought that certain new stock bonuses were not a consequence of a change in manner of operation or condition of the business. The court pointed out that the manner of operation through home office and divisions continued. There was no change in the line of products handled, the territory served, the type or size of the business nor were any new jobs created.

Perhaps this analogy is helpful. A college finds its heating and power-generating plant becoming obsolete and involves the necessity of high expenditure for modern replacement. Its trustees desire, after an investigation and engineers' report, to discontinue the power plant operation, change over its power service from direct to alternating current and to buy its electricity from the local public utility company. But both before and after this change, the faculty continues to meet the students in the appointed class rooms, the same courses are given, the same manner of conducting the registering and dining halls is followed and the resulting product, Bachelors of Arts, is still turned out. Has the college changed its manner of operation? We think not.

We are satisfied that the petitioner has met the burden imposed upon it by § 433 (b) (10) (C) (ii).

3. Int.Rev.Code of 1939, § 711(b) (1) (K) (ii), added by 1941 amendment to Excess Profits Tax Act of 1940, 55 Stat. 18 (1941) 26 U.S.C. Excess Profits Taxes, § 711(b) (1) (K) (ii), provides:

"Deductions shall not be disallowed under such subpagraphs unless the taxpayer establishes that the abnormality or excess is not a consequence of an increase in the gross income of the taxpayer in its base period or a decrease in the amount of some other deduction in its base period, and is not a consequence of a change at any time in the type, manner of operation, size, or condition of the business engaged in by the taxpayer."

The two Acts are compared in 7A Mertens, Federal Income Taxation, § 42.91 (1955).

The petitioner would have us go further and rule that the Commissioner was incorrect in holding that the taxpayer had not established that its abandonment loss was not a cause or consequence of a substantial increase in its gross income in its base period. (Nor substantial decrease in its heat and power cost during the base period.) See § 433(b) (10) (C) (i). It may well be that the taxpayer is right in this respect. But this point was not passed upon by the Tax Court and we think it better that the initial determination of the question should be made by that body.

The judgment of the Tax Court will be reversed and the case remanded for consideration and determination of the questions left for its determination in accordance with this opinion.