American Steel & Pump Corporation v. Commissioner.
American Steel & Pump Corp. v. Commissioner
Docket No. 66844.
United States Tax Court
T.C. Memo 1962-24; 1962 Tax Ct. Memo LEXIS 284; 21 T.C.M. (CCH) 109; T.C.M. (RIA) 62024; February 7, 1962
*284 George R. Sheriff, Esq., for the petitioner. Clarence P. Brazill, Jr., Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income and excess profits tax of $45,802.27 for 1951. Petitioner claims an overpayment of $93,964.01 for the same year. The questions presented are: (1) Whether the basis of assets obtained by petitioner in the liquidation of certain corporations should be ascertained by allocating petitioner's cost of acquiring the stock of the liquidated corporations among the various assets acquired; (2) whether petitioner is entitled to a worthless stock deduction in 1951; and (3) whether certain amounts of interest and bonuses should be treated as abnormal deductions in computing average base period net income for excess profits tax purposes pursuant to section 433(b)(10)(C)(i) and (ii), 1939 Code. Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference. Petitioner filed its corporate income and excess profits tax return for the fiscal year ended November 30, 1951, on an accrual basis with the collector of internal revenue for *285 Lower Manhattan District, New York. The return filed was a consolidated return on behalf of petitioner and its affiliated corporations, Oklahoma Steel Castings Co., Incorporated, FitzSimons Steel Company, and Lawrenceburg Corporation (name changed from A. D. Cook, Incorporated on April 27, 1951). Petitioner was organized on January 30, 1947, under the laws of Delaware as OklahomaIndustrial Corporation. With capital of $150,000 it hoped to acquire profitable going businesses. On February 5, 1947, petitioner's name was changed to All American Industries, Inc. and on November 12, 1947, petitioner's name was changed to American Steel and Pump Corporation. During the period at issue petitioner was a holding company and owned all the authorized and outstanding capital stock of three operating subsidiaries. In 1947 finders located the Oklahoma Steel Castings Company, hereinafter referred to as Old Oklahoma, a Delaware corporation engaged in the business of manufacturing small and medium sized steel castings, both carbon and high and low alloy grades, by the electric furnace process. In order to acquire the business, Robert C. Hardy, one of the organizers of petitioner, arranged for the *286 purchase of the stock of Old Oklahoma. The acquisition of such stock was completed on March 26, 1947. In order to purchase the stock of Old Oklahoma petitioner borrowed $1,054,240 from American Business Credit Corporation payable June 30, 1947. To procure this loan petitioner paid a bonus of $75,000 to American Business Credit Corporation. The stock of Old Oklahoma was temporarily pledged to secure the indebtedness for the purchase price. The cost of acquiring the stock of Old Oklahoma and the allocation of this cost between the fixed assets and other assets was as follows: Cost of Capital Stock
$1,054,240.00
Add: Salary deemed excessive in
amount of $18,000, which
amount is added to cost of
stock
18,000.00
Add: Consultants and finders fees
$ 58,437.75
Total cost of capital stock
$1,130,677.75
Less: Net Assets other than Fixed
Assets
700,810.47
Cost Basis of Fixed Assets
$ 429,867.28
The fixed assets cost of $429,867.28 was allocated by petitioner among the various fixed assets as follows: Fixed Assets
Percentage
Amount
Buildings
34.0170
$146,227.95
Foundry Equipment
50.9026
218,813.62
Office Furn. & Fixtures
3.2295
13,882.56
Autos and Trucks
1.4576
6,265.75
Flasks
7.4529
32,037.58
Land
2.9404
12,639.82
Totals
100.0000
$429,867.28
*287 Immediately following the stock acquisition, Old Oklahoma was liquidated and merged into petitioner. Petitioner retained the cash and other assets aggregating $391,539.37 to satisfy partially the indebtedness incurred in the stock purchase. The operating assets consisting of the land, buildings, machinery equipment, tools, furniture and inventory were transferred by petitioner to a new corporation known as Oklahoma Steel Castings Company, Inc. (hereinafter referred to as New Oklahoma) in exchange for all the stock of New Oklahoma. An appraisal of the fixed assets as of June 1, 1947 for insurance and public financing purposes was as follows: Property and facilities on plant site
$ 984,845
Property and facilities on scrap
steel storage site
19,176
Other property
20,435
Total Fixed Assets
$1,024,456
At a meeting of the petitioner's board of directors on June 16, 1947, $237,852.81 which represented the excess of the amount paid for the stock of Old Oklahoma over the net assets as shown on its books on March 31, 1947, was allocated 30 percent to the buildings account and 70 percent to the foundry equipment account. Shortly after it had acquired the stock *288 of Old Oklahoma, petitioner negotiated for the acquisition of the going business of the FitzSimons Company, (hereinafter referred to as Old FitzSimons) an Ohio corporation engaged in the business of drawing steel into bars. The acquisition was effected by a sale of the Old FitzSimons stock to petitioner followed by a liquidation of the acquired corporation. Petitioner was authorized by its board of directors to borrow $600,000 from American Business Credit Corporation in order to purchase the stock of Old FitzSimons. Later an additional $300,000 was borrowed from American Business Credit Corporation in order to effectuate the purchase. This loan was to be secured by a mortgage on Old FitzSimons' real estate as soon as the stock was purchased and Old FitzSimons liquidated. The cost of the stock of Old FitzSimons and the allocation of such cost between the fixed assets and the other assets was as follows: Cost of Capital Stock
$ 900,000.00
Add: Payment of tax liabilities
of Old FitzSimons, plus
interest thereon to 3/31/47
117,416.58
Add: Consultants and finders fees
37,000.00
Total Cost of Capital Stock
$1,054,416.58
Less: Net Assets other than
Fixed Assets
688,092.28
Cost Basis of Fixed Assets
$ 366,324.30
*289 The seller of the Old FitzSimons stock held petitioner's note for $300,000 and petitioner upon acquisition of the stock was to liquidate Old FitzSimons and give a first mortgage on the real estate and fixed assets as security for the note. FitzSimons was liquidated and immediately thereafter petitioner borrowed $300,000 from the Union National Bank which loan was secured by a mortgage on the real estate and other fixed assets received in the liquidation. Certain accounts receivable received by petitioner upon liquidation were purchased by the sellers of the stock of Old FitzSimons for $139,858.47. Petitioner after reducing the fixed assets value of $366,324.30 by $63,500 which represented the book value of land it sold, allocated the remainder to the fixed assets as follows: Fixed Assets
Per Cent
Amount
Buildings
42.2045
$127,805.48
Machinery & Equipment
55.9534
169,440.49
Office Furniture & Fix-
tures
1.8421
5,578.33
100.0000
$302,824.30
On May 5, 1947, an appraisal of the fixed assets of Old FitzSimons as of February 15, 1947, was as follows: Buildings and Building Fixtures
$200,020.00
Machinery and Equipment
234,050.00
Dies
$ 31,130.00
Office Furniture and Fixtures
8,730.00
Total
$473,930.00
*290 The operating assets of Old FitzSimons subject to the mortgages executed by petitioner were transferred to the Wilson Avenue Steel Corporation, a new corporation formed by petitioner. The name of the corporation was later changed from the Wilson Avenue Steel Corporation to The FitzSimons Steel Company (hereinafter referred to as New FitzSimons). New FitzSimons sold its open accounts receivable to the American Business Credit Corporation under a contract guaranteed by petitioner. Petitioner was also interested in acquiring the going business of A. D. Cook, Inc. by purchasing its stock and then liquidating the corporation. A. D. Cook, Inc. (hereinafter referred to as Old Cook) was an Indiana corporation engaged in the manufacture of deepwell turbines, water well strainers, water well supplies and automatic water supply systems. Consistent with its aim of acquiring Old Cook, petitioner formed the Lawrenceburg Corporation which contracted to purchase the stock of Old Cook for $350,000 cash and $850,000 in notes. An appraisal of the assets of Old Cook as of December 31, 1946 was as follows: Land
$ 124,178.00
Land Improvements
17,161.00
Buildings
614,866.47
Equipment
1,087,223.42
Water supplies
25,183.03
Total
$1,868,611.92
*291 The stock of Old Cook was acquired on September 2, 1947 by Lawrenceburg and the seller was paid $350,000 in cash. Old Cook was liquidated and its assets transferred to Lawrenceburg. In accord with its contract Lawrenceburg delivered to the seller a note for $250,000 secured by United States Government bonds and another note for $600,000 secured by a mortgage on the real property, plant, machinery and equipment received upon the liquidation of Old Cook. Petitioner purchased the unissued 995 shares of Lawrenceburg stock for $600,000. This enabled Lawrenceburg to pay the $350,000 in cash to the seller at the time of the purchase and also enabled Lawrenceburg to purchase Government bonds for $250,000 to secure its note in that amount. Petitioner borrowed $600,000 with an additional charge of $40,000 from American Business Credit Corporation and executed a note bearing 12 percent interest secured by a pledge of the Lawrenceburg stock. Lawrenceburg then changed its name to A. D. Cook Incorporated (hereinafter referred to as New Cook). The cost of acquiring the stock of Old Cook and the allocation of the assets between fixed assets and other assets was as follows: Cost of Capital Stock
$1,200,000.00
Add: Salary deemed to be addi-
tional cost of the capital
stock
46,666.67
Add: Consultants and finders fees
37,000.00
Total Cost of Capital Stock
$1,283,666.67
Less: Net Assets other than
Fixed Assets
738,585.06
Cost Basis of Fixed Assets
$ 545,081.61
*292 After reducing the fixed assets cost of $545,081.61 by items not appearing in the appraisal of $4,150.79, petitioner allocated such cost among the various fixed assets as follows: Percent-
Fixed Assets
age
Amount
Land
6.6455
$ 35,947.56
Buildings
33.8234
182,961.19
Machinery & Equipment
59.5311
322,022.07
100.0000
$540,930.82
Substantially all of the assets of New Cook were sold by authority of the board of directors in February 1951. The remaining assets were not sufficient to satisfy its liabilities. On May 5, 1951, New Cook ceased operations. On December 22, 1955, petitioner filed a claim for refund with the director of internal revenue for the lower Manhattan district. In the claim for refund petitioner maintained that On examination of the consolidated income tax returns of the taxpayer and its subsidiaries, by the Internal Revenue Service, depreciation on said physical properties was improperly computed on the basis of the cost of such properties to the predecessor companies * * * Petitioner also contended that it "did not in fact realize a gain * * * but sustained a loss" on the sale of certain assets in 1951 when the correct basis *293 for the assets is utilized in computing the gain or loss. On January 23, 1957, the Commissioner sent petitioner a statutory notice of deficiency for 1951 in which the Commissioner stated: If a petition to The Tax Court of the United States is filed against the deficiency proposed herein, the issues set forth in your claims for refund should be made a part of the petition to be considered by The Tax Court in any redetermination of your tax liability. If a petition is not filed, the claims for refund will be disallowed and official notice will be issued by registered mail in accordance with Section 3772 of the Internal Revenue Code of 1939. Included in the statutory notice of deficiency was a determination by the Commissioner that petitioner was not entitled to restore to its base period net income for 1947 and 1948 any portion of claimed abnormal deductions for interest and bonuses on borrowings. This determination was explained as follows: It is held that you are not entitled to restore to your base period net income for the fiscal years ended November 30, 1947 and November 30, 1948 any portion of the claimed abnormal deductions of $191,038.13 and $63,991.21, respectively, *294 for bonuses and interest on extensive borrowings under the provisions of Section 433(b)(10)(C)(i) and Section 433(b)(10)(C)(ii) of the Internal Revenue Code of 1939. In its petition to this Court petitioner claimed a deduction for the worthlessness of the stock of New Cook arising from the termination of New Cook's business. Opinion It is apparent from the evidence presented that petitioner through finders was attempting to locate profitable going businesses for acquisition. As a result of petitioner's limited initial capital position, due consideration in each contemplated acquisition was given to the cash and accounts receivable available and the amount that could be borrowed on the remaining assets. To effectuate each purchase petitioner worked in concert with a finance company which dictated the procedure to be employed in acquiring such going businesses. Under the plan formulated petitioner purchased the stock which was then temporarily pledged to secure the indebtedness for the purchase price. The acquired corporation was immediately liquidated and the cash and accounts receivable were applied to satisfy partially the indebtedness incurred in purchasing the stock. The operating *295 assets were transferred to a new corporation encumbered by mortgages to secure the remaining indebtedness. The new subsidiaries continued to conduct the businesses of the liquidated corporations. The question presented concerns the basis of the depreciable property in the hands of the new corporations. The Commissioner claims that the facts indicate petitioner intended to purchase stock and not assets and consequently the so-called Kimbell-Diamond rule is not applicable. Kimbell-Diamond Milling Co., 14 T.C. 74 (1950), affd., 187 F. 2d 718 (C.A. 5, 1951); Commissioner v. Ashland Oil & Refining Co., 99 F. 2d 588 (C.A. 6, 1958). And the basis of the property in the liquidated corporations carries over to the new corporations. Although the Commissioner does not clearly disclose the theory upon which such a contention is predicated it appears from the tenor of his arguments that it is premised on the theory that the liquidations were within the purview of section 112(b)(6), I.R.C. 1939, i.e., a nontaxable liquidation of a subsidiary, and under the provisions of section 113(a)(15), I.R.C. 1939, the basis of the property acquired from the liquidated *296 subsidiary corporation is a substituted basis in the hands of the parent. Petitioner asserts that the basis of the depreciable property is an allocable portion of the amount which it paid for the stock of each corporation and not a substituted basis, citing United States v. M.O.J. Corporation, 274 F. 2d 713 (C.A. 5, 1960), and our decision in North American Service Co., 33 T.C. 677 (1960). In Kimbell-Diamond Milling Co., supra, and Commissioner v. Ashland Oil & Refining Co., supra, the taxpayer was allowed a "stepped up" basis for assets obtained in the liquidation of a subsidiary because it was found that the taxpayer's acquisition of the stock and the subsequent liquidation were intermediate steps in a unitary plan to acquire the underlying assets of the subsidiary. The assets obtained in the liquidation were then integrated into the continuing business of the taxpayer. In United States v. M.O.J. Corporation the Court of Appeals had occasion to consider the situation in which the Taxpayers' witnesses testified that "the intention was to have the business continue to operate with as little impact from change of ownership *297 as possible" and that it was their desire to continue to trade on the good will which had been created by the old companies in their long history. Instead of acquiring an asset to be utilized in the business of a parent corporation, this taxpayer was created for the purpose of stepping as unobtrusively and effectively as possible, and with all the old organizations intact, into the shoes of the existing going businesses. In M.O.J. Corporation, the Commissioner maintained that the Kimbell-Diamond rule was not applicable as the taxpayer admitted that it did not intend to integrate the assets into a continuing business but instead the purpose of the stock purchase was to acquire a going business which the taxpayer intended to operate in a new corporate shell by liquidating the acquired corporations. The court rejected the Commissioner's contention by saying that: If, in fact, the stock in a corporation must be bought in order to obtain that corporation's assets, there is no more justification for treating the acquisition of the stock and dissolution of the corporation as two steps giving rise to tax incidence where it is desired to continue the business of the original corporation *298 than where the acquisition of the stock and dissolution are for the purpose of obtaining the property or assets for their own separate intrinsic value. The essential thing is that here is a corporation that wishes to acquire the assets of another corporation; it does not want the intervening corporate structure; it never intends to keep it in existence for any of the many reasons that one corporation may desire to operate a wholly owned subsidiary as a separate entity; it therefore never intends for it to be a real subsidiary and it never is, in fact, except just long enough to be dissolved. Assuming the correctness of the decision of all of the courts that when this situation exists as a part of a plan to buy specific property the purchase of the stock and liquidation of the corporation owning the property is disregarded we perceive no difference conceptually when it exists as a part of a plan to buy a going business. Similarly in North American Service Co., supra, this Court said: We are convinced that the Kimbell-Diamond rule is not necessarily made inapplicable simply because a going business is continued in a new corporate form. The rule itself was developed *299 on the principle that substance, not form, should govern the tax consequences of a particular transaction. In determining whether, in substance, the objective of the transaction was the acquisition of property, it is necessary to consider all the relevant evidence, of which the failure to integrate the purchased assets into the business of the acquiring taxpayer may well be an important element. However, to make such failure conclusive of the determination, as contended by respondent, would introduce a new artificiality of form and create a rigidity of application inconsistent with the underlying purpose of the rule. In an attempt to distinguish the instant case from M.O.J. Corporation, the Commissioner points out that petitioner was a holding company, as the assets obtained in the liquidations were transferred to new subsidiaries, whereas in M.O.J. Corporation the assets were liquidated into the acquiring corporation which operated the businesses of the acquired corporations. As we view it, this factual deviation is not significant in determining the applicability of the principle enunciated *300 by the court in M.O.J. Corporation. We realize that the procedure employed, namely, transferring the assets to new subsidiaries with corporate names and trademarks which varied only slightly from those of the acquired corporations probably enabled petitioner to utilize any good will which attached to such corporate names and trade marks. However, in M.O.J. Corporation it was apparent to the court that the taxpayer "[desired] to continue to trade on the good will which had been created by the old companies in their long history." And we believe petitioner's attempt in the case before us to take full advantage of any good will generated by the acquired corporations does not distinguish this case from M.O.J. Corporation, but instead presents the question of whether any portion of the amounts paid for the stock of the various corporations was referable to or should be allocated to good will. In North American Service Co., supra, at page 695, we said that "The mere fact that a predecessor business possesses goodwill does not constitute proof that an acquiring corporation has purchased *301 that goodwill." And petitioner here introduced testimony that there was no intent to purchase good will and in the negotiations to acquire the respective corporations no consideration was given to good will. A valuation engineer testifying on behalf of the Commissioner stated that his computations under A.R.M. 34, 2 C.B. 31, a formula frequently utilized to value good will and other intangible assets, revealed that Old Oklahoma had good will of $359,825 but that neither Old FitzSimons nor Old Cook possessed good will. Inasmuch as the Commissioner's own witness agreed with petitioner's claim that Old FitzSimons and Old Cook had no good will, the only remaining question to be decided insofar as good will is concerned, is whether any part of the amount paid for the stock of Old Oklahoma should be allocated to good will. The parties stipulated that New Oklahoma had a cost basis for fixed assets of $429,867.28. Under the valuation engineer's computations only $70,042.28 ($429,867.28 - $359,825) represents fixed assets other than good will. However, an analysis of the fixed assets reveals that they included land, buildings, foundry equipment, autos and trucks, office *302 furniture and equipment, and flasks. Although we agree with the Commissioner that the evidence pertinent to this point indicates that a part of the amount paid for the stock of Old Oklahoma should be allocated to good will in valuing the assets of New Oklahoma, we do not believe after a thorough examination of all the evidence with respect to the value of the above enumerated fixed assets that the amount ascribed to good will by the valuation engineer is correct. Based on a consideration of the entire record we conclude that the amount allocable to good will should not exceed $100,000 and the "stepped up" basis of the fixed assets for depreciation should be adjusted accordingly. The next question involves the claim by petitioner that it is entitled to a worthless stock deduction in 1951 for the stock of New Cook. The question of whether stock became worthless during a given taxable year is a question of fact. Boehm v. Commissioner, 326 U.S. 287 (1945). There is no partial deduction for worthless stock as in the case of a bad debt, accordingly the deduction must be taken in *303 the year in which the stock becomes worthless or the deduction is lost. Cooley Butler, 45 B.T.A. 593 (1941). In Sterling Morton, 38 B.T.A. 1270, 1278 (1938) this Court, discussing the problem of ascertaining the year of worthlessness of stock said: that stock may not be considered as worthless even when having no liquidating value if there is a reasonable hope and expectation that it will become valuable at some future time, and that such hope and expectation may be foreclosed by the happening of certain events such as the bankruptcy, cessation from doing business, or liquidation of the corporation, or the appointment of a receiver for it. Such events are called "identifiable" in that they are likely to be immediately known by everyone having an interest by way of stockholdings or otherwise in the affairs of the corporation; but, regardless of the adjective used to describe them, they are important for tax purposes because they limit or destroy the potential value of stock. Our findings show that the operating assets of New Cook were sold in 1951 and the remaining assets were not sufficient to satisfy the outstanding liabilities. It follows from these *304 findings that the stock had no liquidating value in 1951 and in addition in that year any "reasonable hope and expectation" that the stock would become valuable at some future time was "foreclosed" by New Cook's "cessation from doing business." Accordingly, we conclude that petitioner has sustained its burden of proving that an "identifiable" event occurred in 1951 and we hold the stock became worthless in that year. The last question concerns petitioner's contention that the interest and bonuses paid in 1947 and 1948 with respect to the short-term borrowings necessary to acquire the stock of the various corporations constituted abnormal deductions in those years which should be eliminated in computing the average normal base period net income for excess profits tax purposes. In Gulf States Utilities Co., 16 T.C. 1381, 1391 (1951) we stated that: In order for a taxpayer to be entitled to have abnormal deductions disallowed in the computation of its base period net income, each requirement of the appropriate sections of the Internal Revenue Code must be satisfied. In the *305 event the taxpayer fails to satisfy any one of the provisions of the Code, his contentions for relief must fail. The Commissioner maintains that in the instant case the interest and bonuses cannot be disallowed under section 433(b)(9) inasmuch as petitioner has not established under section 433(b)(10)(C) that the deductions were not "a consequence of an increase in the gross income * * *" or "a change * * * in the type, manner of operation, size, or condition of the business * * *" We considered the burden trrust upon the taxpayer in this type situation in William Leveen Corporation, 3 T.C. 593 (1944) and said: Perhaps the proof is best made by proving affirmatively that the abnormal deduction is a consequence of something other than the increase in gross income and that such proven cause is the converse or opposite of an increase in gross income and could not be identified with an increase in gross income. * * * Petitioner has introduced evidence showing that its original capital was not sufficient to enable it to purchase the stock of the various corporations which necessitated extensive short-term borrowing. As set forth in our findings, petitioner in order *306 to procure such loans had to pay the lender a bonus in addition to a high interest rate. We are convinced that the evidence does establish that these deductions were abnormal and neither the "consequence of an increase in the gross income" nor "a change * * * in the type, manner of operation, size, or condition of business * * *". In light of this affirmative proof we hold that such amounts should be disallowed as deductions in 1947 and 1948 in computing the average base period net income for excess profits tax purposes. Arrow-Hart & Hegeman Electric Co., 7 T.C. 1350 (1946). Decision will be entered under Rule 50.