AGENCY OF CANADIAN CAR AND FOUNDRY COMPANY, LIMITED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 83825, 83826.   Filed October 3, 1962.

16

*George E. Cleary*, *Esq.*, and *Walter S. Rothschild*, *Esq.*, for the petitioner.

*Theodore E. Davis*, *Esq.*, and *Lionel Savadove*, *Esq.*, for the respondent.

HARRON, *Judge:* The respondent determined deficiencies in income tax for the years 1954–1957, inclusive, as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 83825 | 1954 | $55,853.58 |
| 83825 | 1955 | 155,219.18 |
| 83825 | 1956 | 125,352.70 |
| 83826 | 1957 | 125,032.43 |

Petitioner received a Mixed Claims Commission award in 1939 under a claim against Germany for sabotage losses sustained in 1917. During the taxable years, petitioner received payments from the United States Treasury Department with respect to the award. The questions for decision are: (1) Whether the payments on the award received in the taxable years qualify as capital gain under section 1232(a)(1) of the 1954 Code, or are taxable as ordinary income. (2) Whether petitioner, an accrual basis taxpayer, is entitled to deduct in 1955, 1956, and 1957 additional New York corporation franchise taxes for those years which it reported and paid in 1961.

### FINDINGS OF FACT.

Some of the facts have been stipulated. They are found as stipulated; the stipulations are incorporated herein by this reference.

Petitioner is a New York corporation which was incorporated in

1915; its principal office is in New York City. Its returns for the taxable years were filed with the director of internal revenue for the District of Lower Manhattan. Petitioner keeps its books and files its returns on an accrual method of accounting.

*Issue 1.*—On January 11, 1917, petitioner's plant and factory at Kingsland, New Jersey, was completely destroyed by explosions and fires. Prior thereto petitioner's principal business was the production of munitions for sale to Allied Governments during World War I. The destruction of the Kingsland plant gave rise to a claim of the petitioner against the Government of Germany for damages resulting from sabotage, which was duly filed in 1924 by the United States on behalf of the petitioner with the Mixed Claims Commission, United States and Germany. The Commission was established pursuant to the agreement of August 10, 1922, between the United States and Germany to determine the amounts to be paid by Germany in satisfaction of Germany's financial obligations to the United States Government and its nationals for losses and damages sustained during World War I, as provided for under the Treaty of Berlin concluded between the two Governments on August 25, 1921.

In due course, the Mixed Claims Commission entered an award in petitioner's favor on October 30, 1939. The decision of the Commission was that the German Government was liable to the United States Government, on behalf of petitioner, for damages for losses sustained at Kingsland, and that under the Treaty of Berlin, the German Government was obligated to pay the United States, on petitioner's behalf, the sum of $5,871,105.20 with interest from January 31, 1917, to the date of payment, at the rate of 5 percent per annum. The decision of the Commission was final and binding upon the two Governments.

Although petitioner's claim was presented to the Mixed Claims Commission by a representative of the United States, of necessity, and the title of the proceeding was "United States of America on behalf of Agency of Canadian Car and Foundry Company, Limited, Claimant *v.* Germany," petitioner engaged and paid its own attorney, Amos J. Peaslee, who actively participated throughout the proceedings.

The Congress enacted the Settlement of War Claims Act of 1928 on March 10, 1928 (Pub. L. 122, ch. 167, 45 Stat. 254), which was later amended by the Act of March 3, 1933, and the Act of August 6, 1947. (Pub. L. 426, 72d Cong., 2d Sess., ch. 210; Pub. L. 375, 80th Cong., 1st Sess., ch. 506.) This Act made provisions *inter alia* for the settlement of certain claims of American nationals against Germany and, in general, it created the system under which the awards of the Mixed Claims Commission would be paid. It provided that the Secretary of State should certify to the Secretary of the Treasury the

awards made by the Mixed Claims Commission; it created a German special deposit account in the Treasury into which there would be deposited all funds specified and from which there would be disbursed all payments authorized, including payments on account of the certified awards of the Mixed Claims Commission. The Secretary of the Treasury was authorized to make payments out of the German special deposit account in accordance with such regulations as he deemed necessary. Such Act also provided that there should be deducted from each payment out of the special deposit account an amount equal to one-half of 1 percent thereof as reimbursement for the expenses incurred by the United States in respect of the payments. The Act as amended established certain priorities of payments out of the special deposit account. It also authorized the Secretary of the Treasury to pay out of the special deposit account an amount equal to the principal of each certified Mixed Claims Commission award, plus the interest accruing thereon up to January 1, 1928; and to pay simple interest at the rate of 5 percent per annum beginning January 1, 1928, on the unpaid balances, until paid, of the total sum of each award on January 1, 1928, arrived at by adding the interest accrued to that date to the amount of the individual awards.

Under the provisions of the Settlement of War Claims Act of 1928, referred to above, the Mixed Claims Commission award on petitioner's claim in the amount of $5,871,105.20 accumulated 5-percent interest each year from January 31, 1917, to January 1, 1928, in the amount of $3,204,980.03; the accumulated interest was added to the principal amount of the award resulting in a total principal sum of $9,076,085.23; after January 1, 1928, 5-percent interest per year then accrued on the principal sum of $9,076,085.23.

On June 23, 1930, the United States and Germany concluded another treaty providing for the final discharge of obligations of Germany to the United States in respect of awards of the Mixed Claims Commission and the costs of the United States Army of occupation. This agreement provided *inter alia* for the funding of Germany's obligations under the awards of the Mixed Claims Commission. Germany issued to the United States bonds of Germany in amounts believed sufficient to pay all of the awards made and to be made by the Commission, and interest thereon, to the United States and its nationals. The 1930 German bonds were held in the German special deposit account. Germany agreed to pay in satisfaction of its obligations under the awards of the Commission, plus interest, the sum of 40,800,000 reichsmarks for the period September 1, 1929, to March 31, 1930, and the sum of 40,800,000 reichsmarks per annum from April 1, 1930, to March 31, 1981. As evidence of this indebtedness, Germany issued to the United States bonds dated September 1, 1929, in the total amount of 40,800,000 reichsmarks, maturing March 31, 1930,

and additional bonds in the total amount of 40,800,000 reichsmarks maturing serially on March 31 and September 30 in each succeeding year until March 31, 1981. The obligations of Germany were to end as soon as all of the payments contemplated by the Settlement of War Claims Act of 1928 were completed and the bonds not then matured evidencing such obligations were then to be canceled and returned to Germany. All of the bonds were to be paid at the Federal Reserve Bank of New York in funds immediately available in gold coin in an amount in dollars equal to the amount due in reichsmarks at a prescribed exchange rate.

In 1933, Germany defaulted on its bonds issued pursuant to the 1930 agreement. In fact, no payments were made to the United States on account of these bonds after 1933.

In 1952 a conference was held in London which dealt with the external debts of Germany owed to the United States and other Allied Governments, including the indebtedness of Germany for awards made by the Mixed Claims Commission, United States and Germany, payment of which was in default. A representative of the United States Treasury reported that the amounts due to private claimants under the awards as of December 31, 1951, totaled $103,758,733.03.

The Federal Republic of Germany agreed to assume the prewar external debt of the German Reich. The London Debt Settlement Conference discussed *inter alia* the means to be adopted to deal with the defaulted Mixed Claims bonds issued by the German Government pursuant to the agreement of June 23, 1930, on which only three installments had been paid.

At the London conference an agreement relating to Germany's indebtedness for awards made by the Mixed Claims Commission on behalf of nationals of the United States was signed by the Federal Republic and the United States, which became effective on September 16, 1953. It provided in general as follows: The Federal Republic agreed to pay to the United States $97,500,000 in 26 annual installments, in lawful currency of the United States, at the Federal Reserve Bank of New York for the credit in the general account of the Treasurer of the United States beginning on April 1, 1953, through April 1, 1978. Five installments were to be paid in the amount of $3 million; 5 in the amount of $3,700,000; and 16 in the amount of $4 million. In the event any installment was not paid on the due date, such installment was to bear interest of 3¾ percent per annum until paid. The total payment of $97,500,000 was to be made by the Federal Republic "on behalf of those nationals of the United States, or their successors or assignees, on whose behalf awards of the Mixed Claims Commission, United States and Germany have heretofore been entered which amounts have not been fully satisfied."

As evidence of its obligations under the 1953 agreement, the Federal Republic issued 26 bonds; they were dated January 1, 1953; they matured and became payable serially on the first day of April in 1953 and each year thereafter including 1978; each bond was made payable in dollars to the Government of the United States at the Federal Reserve Bank of New York; the bonds on their face recited as the consideration for the Federal Republic's agreement to make payment of the bonds the mutual covenants contained in the agreement of September 16, 1953, and stated that the bonds were issued pursuant to that agreement; each bond stated that if the bond was not paid on its due date, interest on the face amount would be paid from such date until the date of payment at the rate of 3¾ percent per year. The bonds did not have any interest coupons attached. The form of the bonds is incorporated herein by this reference. The bonds were signed for the Federal Republic of Germany by appropriate officers of the Federal Republic.

The bonds were delivered to the Secretary of the Treasury of the United States at the Treasury Department in Washington, D.C. Upon receipt thereof, the United States Government canceled and delivered to the Federal Republic the 24 1930 bonds of Germany which were in default having maturity dates of September 30 of 1931 through 1942, and March 31 of 1932 through 1943.

Under the agreement of September 16, 1953, the United States agreed to apply all of the payments made by the Federal Republic in reduction of the remaining indebtedness of Germany in respect of awards of the Mixed Claims Commission made on behalf of nationals of the United States; and settlement of the indebtedness of Germany in respect of the awards of the Mixed Claims Commission to the United States on its own behalf was to be deferred until the final general settlement envisaged in another agreement, the Agreement on German External Debts, signed in London on February 27, 1953. Thus, all of the payments of the Federal Republic under its bonds dated January 1, 1953, were to be applied by the United States in reduction of the awards to United States nationals, except for the fee of one-half of 1 percent which the United States was authorized to deduct from each payment to an award holder by section 2 (e) of the Settlement of War Claims Act of 1928.

The Federal Republic paid the United States the first five installments of $3 million, each, the principal amounts of five of its bonds due on the first of April in 1953 through 1957. The receipts were deposited in the German special deposit account in the Treasury.

At some time during the fiscal year ended June 30, 1955, the Treasury Department received from the Department of Justice, the sum of $701,974.86, which represented a part of the residue of retained

German property seized by the United States during World War I and held by the Alien Property Custodian. This sum was deposited in the German special deposit account in the Treasury under authorization given to the Secretary of the Treasury by section 4(a) of the Settlement of War Claims Act of 1928. According to the Annual Report of the Secretary of the Treasury on the state of the finances for the fiscal year ended June 30, 1955, page 101, the payments into the German special deposit account of the $3 million installment paid by the Federal Republic on April 1, 1955, and the sum received from the Department of Justice made possible a further distribution of 6 percent to holders of Mixed Claims awards, which distribution was made on account of interest accrued on the awards.

With respect to the loss which petitioner sustained when its Kingsland plant was destroyed in 1917, petitioner took a loss deduction of $2,799,324.77 in its Federal income tax return for 1917. This deduction was fully offset by the income reported in the return.

Between October 30, 1939, when the Mixed Claims Commission made the award to the United States in behalf of petitioner of $5,871,105.20, and January 10, 1941, petitioner did not receive any payment on account of the award chiefly because of litigation relating to its and other awards which was pending in Federal courts.

On January 10, 1941, the first payment on the award was made to petitioner out of the German special deposit account by the Treasury Department in the amount of $6,474,238.37, less the one-half of 1-percent service charge, $32,371.19, or the net sum of $6,441,867.18.

The balance due on petitioner's award as of January 1, 1928, was $9,076,085.23, representing the principal amount of the award plus accrued interest thereon up to January 1, 1928, which at that time was added to the principal amount under a provision of the Settlement of War Claims Act. This payment was made on the "principal account" in petitioner's award account in the German special deposit account and reduced the unpaid balance thereof to $2,601,846.86 as of January 10, 1941.

As of the same date, the balance due in the "interest account" in petitioner's award account in the special deposit account was $5,910,-645.09, representing interest accrued on the "principal account" from January 1, 1928, to January 10, 1941.

As of April 5, 1941, and October 15, 1941, payments of $130,092.34 and $109,644.20, respectively, were made to petitioner on its award. (The net amounts after the deduction of the service charge were $129,441.88 and $109,095.98.) These payments were credited to the "principal account" in petitioner's award account reducing the unpaid balance thereof to $2,362,110.32 as of October 15, 1941. As of that

date the balance of the accrued "interest account" in the award account was $6,006,289.70.

The Settlement of War Claims Act established certain priorities in payments out of the German special deposit account, and that certain payments on account of Mixed Claims Commission awards would represent payments in reduction of principal, and other payments would represent payments in reduction of interest accrued on principal. For example, under the Act the Secretary of the Treasury was authorized to pay to award holders of the third class, in which category was petitioner's award, up to but not more than 80 percent of the amount of principal (principal plus interest to January 1, 1928).

Petitioner was advised by the Treasury that the payment made as of October 15, 1941, completed the payments to it in reduction of principal in the principal account portion of its award account. Thereafter, all of the payments to petitioner, under the Settlement of War Claims Act, as amended, were stated to represent payments in reduction of the interest accrued on principal in the principal account.

Petitioner received further payments from the Treasury out of the German special deposit account in 1947, 1948, 1952, and 1953. All of these payments were designated as part payment of accrued interest on the award pursuant to provisions of the Settlement of War Claims Act of 1928, as amended.

In April of 1954, 1955, 1956, and 1957, petitioner was advised by the Treasury Department that by reason of the receipt from the Federal Republic of Germany of the current year's annual installment payment under the 1953 agreement, the Secretary of the Treasury, under the provisions of the Settlement of War Claims Act of 1928, as amended, had authorized payments to it "on account of the interest" on its award. Petitioner was advised, further, that in accordance with the Act of August 6, 1947, Public Law 375, amending the Settlement of War Claims Act, the payment of the distributions would, "for the purpose of further accruals of interest only," reduce the principal balance upon which interest would accrue. The net amounts, after taking into account expenses properly allocable thereto, received by petitioner out of the German special deposit account in the taxable years 1954–1957, were as follows:

| | |
|---|---|
| 1954 | $251,751.01 |
| 1955 | 307,682.39 |
| 1956 | 245,198.81 |
| 1957 | 240,554.87 |

The amounts paid to the petitioner out of the German special deposit account in the years 1954–1957, inclusive, represented its share

of the installment payments made by the Federal Republic of Germany to the United States under the 1953 agreement, in retirement of its bonds numbered 2, 3, 4, and 5, which became due in those years; except that a part of the amount which petitioner received in 1955 represented its share of the distribution to award holders of the sum of $701,974.86 received in 1955 by the Treasury Department from the Department of Justice, representing funds derived from a part of the residue of German property held by the Alien Property Custodian.

In its Federal income tax return for 1954, petitioner reported the net amount received from the Treasury out of the German special deposit account as long-term capital gain. In its returns for 1955, 1956, and 1957, petitioner reported the net payments received in 1955, 1956, and 1957 as returns of capital. In determining the deficiencies for the taxable years, the respondent held that the amount received in each year in respect of the award of the Mixed Claims Commission constitutes ordinary income; he included in the taxable income of each year the entire net amount received in respect of the award of the Mixed Claims Commission.

*Issue 2.*—The statutory notices of deficiency which give rise to these proceedings were mailed on July 28, 1959, and October 2, 1959, and the petitions were timely filed thereafter on October 26, 1959.

In its petitions, the petitioner claimed that the payments received in the taxable years in respect of the Mixed Claims Commission award were taxable for Federal income tax purposes as long-term capital gains under section 1232 of the 1954 Code. Petitioner did not claim in its petitions that the receipts represented a return of capital.

In its original Federal income tax returns for 1955, 1956, and 1957, petitioner took the position that the payments received in those years in respect of the award represented a return of capital and, accordingly, no part thereof was included in taxable income.

In its original reports for the New York corporation franchise tax for 1955, 1956, and 1957, petitioner did not include in income any part of the amounts received in respect of the awards, but reported the receipts as return of capital. Petitioner reported and paid corporation franchise taxes as follows:

| Year | New York franchise tax |
|------|------------------------|
| 1955 | $264.92 |
| 1956 | 870.64 |
| 1957 | 1,390.17 |

Petitioner deducted the above amounts of New York corporation franchise taxes in its original Federal income tax returns for 1955–1957, inclusive. The deductions were allowed by the respondent.

On or about February 1, 1961, petitioner voluntarily filed for the years 1955, 1956, and 1957 amended Federal income tax returns in

which it reported the net amounts received in those years out of the German special deposit account as long-term capital gains. Also, petitioner took deductions for additional New York corporation franchise taxes on the basis of the inclusion in income, for the purposes of that tax, of the entire net amount received in each year in respect of the awards because under the New York corporation franchise tax law no distinction is made between ordinary income and capital gain. The amounts of the deductions for increased corporation franchise taxes which were taken in the amended Federal income tax returns are as follows:

| Year | Additional franchise taxes |
|---|---|
| 1955 | $16,103.57 |
| 1956 | 12,614.81 |
| 1957 | 12,583.97 |

In amendments to its petitions in these proceedings, the petitioner made claims for deductions for additional New York corporation franchise taxes for 1955, 1956, and 1957 in the amounts above stated.

Also, on or about February 1, 1961, petitioner voluntarily filed amended New York corporation franchise tax reports for 1955, 1956, and 1957, giving as the reason the following explanation: "These amended reports are filed in accordance with requirements necessitating such filings whenever amended federal returns are filed." In the amended New York franchise tax returns, petitioner included in taxable income the entire net amount received in each year on account of the award because under New York law no distinction is made between ordinary income and capital gain. However, in so reporting such income the following explanation was given in the amended corporation franchise tax reports: "Net long-term capital gains—Amounts received on account of retirement of German Federal Government bonds (less expenses applicable thereto) previously reported as return of capital." The additional income reported served to increase the New York corporation tax and petitioner paid the additional tax for each year on or about February 1, 1961. The following schedule shows the total corporation franchise taxes reported in 1961 in the amended New York returns; the amounts of the taxes reported originally in the returns for 1955, 1956, and 1957; and the additional amounts of taxes reported and paid in 1961:

NEW YORK CORPORATION FRANCHISE TAX

| Year | Tax due per returns filed in 1961 | Tax paid per original returns | Additional tax paid in 1961 |
|---|---|---|---|
| 1955 | $16,368.49 | $264.92 | $16,103.57 |
| 1956 | 13,485.45 | 870.64 | 12,614.81 |
| 1957 | 13,974.14 | 1,390.17 | 12,583.97 |

OPINION.

*Issue 1.*—The facts in these cases are substantially the same as in *Richard T. Graham*, 36 T.C. 612, affd. 304 F. 2d 707 (C.A. 2, 1962). Petitioner contends, however, that it has proved that the holders of awards of the Mixed Claims Commission, United States and Germany, including itself, were the beneficial owners of the bonds of the Federal Republic of Germany, issued in 1953, and other facts which it alleges were not established in the *Graham* case; that the *Graham* case is, therefore, distinguishable and not controlling; that there was retirement at maturity of some of the German bonds in the taxable years which resulted in petitioner's realization of capital gains within the provisions of section 1232(a)(1) of the 1954 Internal Revenue Code[1] with respect to the payments received by petitioner on its award. An essential part of petitioner's argument is the contention that the 1953 bonds were in registered form within the meaning of section 1232(a)(1). Petitioner refers to the form of the bonds, which on their face were promises to pay the Government of the United States of America on behalf of those nationals of the United States holding unpaid awards of the Mixed Claims Commission; they were not bearer bonds or in negotiable form; and by reference to the terms of the 1953 agreement with the Federal Republic, no transfer of the bonds was contemplated. Petitioner argues that the fact that award holders did not directly hold the German bonds and hence were not the registered holders of record is irrelevant because, according to petitioner's proposition, the United States held the bonds as trustee or fiduciary for the benefit of the award holders, and it is alleged that "a bond does not lose its character as a registered bond merely because the registered holder is a broker, agent, nominee or fiduciary, rather than the beneficial owner."

Respondent contends that the application of section 1232(a)(1) is limited to bonds and other evidences of indebtedness "which are capital assets in the hands of the taxpayer," and he refers to the general definition of *holder* as "one in possession of the instrument and entitled to maintain an action at law on it." 8 Am. Jur., Bills and Notes, sec. 335. He argues that even assuming that holders of Mixed Claims Commission awards are the beneficiaries of the German bonds,

---

[1] Sec. 1232, I.R.C. 1954, provides in part:

(a) GENERAL RULE.—For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of indebtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or government or political subdivision thereof—

   (1) RETIREMENT.—Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954).

their situation is not different from that of beneficiaries of a trust, the trustee of which owns and holds bonds. He takes issue with petitioner on the point that for the purposes of section 1232(a)(1) it is of critical importance that bonds and other evidences of indebtedness are held by someone other than the beneficiaries of the proceeds. Respondent relies upon the *Graham* case which he regards as controlling and indistinguishable.

The petitioner is an original award holder. Unlike Graham, petitioner did not acquire by purchase an interest in an award entered in behalf of another, and in that sense petitioner is not claiming that it acquired a capital asset.

Under the 1953 agreement, the Federal Republic of Germany assumed the obligation of the former Government of Germany on the unpaid awards, and interest thereon, which had been entered by the Mixed Claims Commission in favor of the United States on behalf of its nationals, and in so doing the Federal Republic agreed to pay to the United States the negotiated sum of $97,500,000 in 26 annual installments. The payments received by the petitioner on account of its award in the taxable years from the Treasury Department were partial payments of its award, the indebtedness of the Federal Republic.

The *Graham* case holds that amounts received in payment of indebtedness under an award of the Mixed Claims Commission cannot be treated as capital gain within the limited scope of section 1232(a)(1) because, first, the payment of an obligation cannot be considered as an amount "received in exchange" of a capital asset, *Fairbanks* v. *United States*, 306 U.S. 436; *Bingham* v. *Commissioner*, 105 F. 2d 971; and, second, a Mixed Claims Commission award (which gives rise to the debt) is not "issued" by a "government or political division thereof."

Petitioner does not dispute the correctness of the above holding in the *Graham* case.

The problem here is whether in these cases, the taxpayer has established certain facts relating to its alleged interest in the 1953 German bonds, which were not established in the *Graham* case, so as to require reaching a different result upon the basis of a contention which was not presented to this Court in the earlier case, but was presented for the first time on appeal from this Court's decision. That contention is that the sums received by petitioner in the taxable years were received on the retirement of bonds issued by the Government of the Federal Republic of Germany, that the bonds were issued in registered form, and that for the purposes of section 1232(a)(1), the petitioner and the rest of the award holders were the "beneficial owners" of the bonds when they were issued in 1953 by the Government of the Federal Republic.

All of petitioner's evidence has been fully considered, but it constitutes merely argumentative material which must be regarded as immaterial in the face of the paramount fact that the 1953 bonds were payable to the Government of the United States and none was payable to petitioner. None of the bonds evidenced a right of ownership by any award holder.

The record here shows that at the London debt conference, there was some discussion about the alternative procedure of the German Government's issuance of bonds made payable to the individual holders of awards, but the award holders believed that issuance of the bonds to the Government of the United States was preferable. The new bonds were so issued and were held by the United States.

The installments paid by the Government of the Federal Republic to the United States represented payments on the remaining indebtedness of Germany of $97,500,000, in respect of the awards, and as each annual installment was paid to the United States, that part of the indebtedness, represented by a bond issued in 1953, was discharged. Each bond evidenced a part of the negotiated amount of the German debt which was payable to the United States on behalf of those nationals of the United States, on whose behalf awards of the Mixed Claims Commission had been entered in proceedings instituted by the United States, on which interest had accrued. As the United States received the annual installment payments from the German Government, it handled such funds under the directions and authorizations set forth in the Settlement of War Claims Act of 1928, as amended; that is to say, in accordance with the provisions of a Federal statute. Thus, although under the 1953 agreement with the Federal Republic of Germany, the Government of the United States agreed to "apply the payments made by the Federal Republic * * * in reduction of the remaining indebtedness of Germany in respect of awards of the Mixed Claims Commission" made on behalf of nationals of the United States, the United States did so under the provisions of a law enacted by the Congress of the United States which governs the administration by the Treasury Department of the German special deposit account and disbursement of funds to and among all of the individual holders of awards.

Nothing in the record before us, in our opinion, serves to distinguish these cases, in principle, from the *Graham* case, or to require a conclusion other than that made by the Court of Appeals in its affirmance of this Court's decision, namely, that the payments made to an award holder by the Treasury Department were not in retirement of bonds, but were payments made on account and in respect of an award.

The analysis of what is involved in the Treasury Department's payments to award holders which we believe is necessitated by the whole statutory scheme of the Settlement of War Claims Act of 1928, as

amended, inevitably leads to recognizing that the payments received by petitioner in the taxable years out of the German special deposit account represented payments of accrued interest on its award and were not to the petitioner amounts received on the retirement of bonds. See *Edna S. Ullman*, 34 T.C. 1107, 1109. In fact, each payment involved here was designated by the Treasury Department as a payment made on account of interest on petitioner's award which had been accrued but not paid prior to the specific payment. Furthermore, petitioner received from the Treasury on January 10, 1941, a payment of over $6,474,000, and the Treasury advised petitioner that additional payments in April and October of 1941 of over $200,000 completed the payments on account of principal, and thereafter all payments by the Treasury were payments in reduction of the interest accrued on principal, which was in accordance with a system of priorities in payments which had been established by the Settlement of War Claims Act, as amended. See *Estate of Adolf Kuttroff*, 38 T.C. 824 (1962).

The foregoing must be considered in the light of the status of section 1232(a)(1) which is "a carefully limited exception" (*Graham* v. *Commissioner, supra*) to the general rule that the payment of an obligation cannot be a "sale or exchange" of a capital asset which could result in capital gain. *Graham* v. *Commissioner, supra*. Petitioner's carefully devised contentions, if approved, would broaden the scope of section 1232(a)(1) in a manner and to an extent which clearly would be far beyond the intendment of the Congress in making the carefully limited exception to the general rule which is made by section 1232(a)(1).

There is no merit to petitioner's general contention that the payments it received in the taxable years from the Treasury out of the German special deposit account were "amounts received by the holder on retirement of such bonds," within the meaning and intent of section 1232(a)(1). Since it cannot be concluded that petitioner was a "beneficial owner" of any of the 1953 German bonds, or parts thereof, it is unnecessary to decide whether the 1953 German bonds were issued in registered form. Even if the bonds can be said to have been issued in registered form, such conclusion would not be helpful to the petitioner in view of the conclusions reached above.

Consideration has been given to the testimony of petitioner's chief witness expressing an opinion about the interests in the 1953 bonds of petitioner and the other award holders, as well as to other opinions included in some reports. But the issue involves determining whether the provisions of section 1232(a)(1) are applicable and in construing the intendment and meaning of the statute this Court must make the ultimate conclusion. In so doing it is not required to adopt the opinions and conclusions presented by witnesses. The award holders were beneficiaries of the awards and of the 1953 agreement between

the United States and the Federal Republic of Germany, but they did not acquire ownership of the bonds.

The petitioner has failed to establish any distinction in the facts or in principle between these cases and the *Graham* case.

It is concluded that the amounts received in the taxable years from the Treasury Department do not represent amounts received in exchange for bonds issued by a government which were held by petitioner as capital assets within the provisions of section 1232(a)(1). The respondent correctly determined that the payments received are taxable as ordinary income.

*Issue 2.*—The question under this issue is whether the petitioner properly may accrue in each of the years 1955, 1956, and 1957 the amounts of additional New York corporation franchise taxes which resulted from its voluntarily filing on February 1, 1961, amended franchise tax reports for those years in which petitioner elected to report as income from capital gains the net amounts received in each year on account of the award. Petitioner claims a deduction in each of the above years for the additional franchise tax.

The respondent contends that under the facts the only year in which the additional franchise taxes for 1955–1957, inclusive, can be accrued and, therefore, deducted for Federal income tax purposes is 1961. He relies on *Gunderson Bros. Engineering Corp.*, 16 T.C. 118, 125–127; and Rev. Rul. 57–105, 1957–1 C.B. 193.

It is held that petitioner, an accrual taxpaper, cannot accrue in 1955, 1956, and 1957, for the purpose of the claimed deductions, the additional amounts of State corporation franchise tax. The claimed deductions are, therefore, not allowable in the particular taxable years. The reasoning of the *Gunderson* case applies and is controlling.

Petitioner did not concede until 1961 that there should be included in taxable income for the purposes of the New York franchise tax the net amount received in each year in respect of the award and that consequently it was liable for additional franchise tax. Petitioner did not accrue the taxes in question on its books in 1955, 1956, and 1957. The additional tax which petitioner now seeks to accrue and deduct in each of the years in question was not the result of innocent error or oversight on its part. Rather, petitioner's failure to accrue the full amount of the State franchise tax in those years and to claim deductions therefore in its original Federal income tax returns was due to the then view of the petitioner that the payments received on account of the award in each year represented a return of capital. Petitioner in its original New York franchise tax reports, in effect, denied that its income for each year was greater than was reported and, by the same token it denied, in effect, that its liability for the franchise tax was any greater than was reported and paid for each year. It is of no consequence that there was no dispute or litigation between petitioner and

the State tax authorities over the matter in or before 1961, and that petitioner "voluntarily" filed amended State returns in which it conceded that its income for each of the years and the franchise taxes were larger than originally reported. It was not until 1961 that petitioner acknowledged its additional franchise tax liability and until then petitioner was in effect denying any greater tax liability than it had accrued in each of the years involved and reported originally. See also *Globe Tool & Die Manufacturing Co.*, 32 T.C. 1139, where it was held that an accrual taxpayer could not deduct as accrued liabilities additional payments on account of the Massachusetts corporation excise tax in years prior to payment or other acknowledgment of liability.

Consideration has been given to petitioner's suggestion that the holding in the *Gunderson* case is inconsistent with the conclusions in *H. E. Harman Coal Corporation*, 16 T.C. 787, on other issues, modified 200 F. 2d 415; and *Gulf States Utilities Co.*, 16 T.C. 1381. We have reexamined the cited cases and are satisfied that the reasoning of the *Gunderson* case is correctly to be applied here and that the conclusions reached in the cited cases are not inconsistent with the reasoning in the *Gunderson* case.

*Decisions will be entered for the respondent.*